# In re Brzostowski

C.P. of Northumberland County, no. CV-99-576.

*Joey A. Storaska,* for petitioner.
*John M. Gallagher,* for respondent.

FEUDALE, *S.J.,* July 1, 1999—Before the court is a petition for change of name filed by the father to change the surname of a child from Mother's to his birth name. Jacob Michael Brzostowski was born on March 31, 1997. His mother, Christie L. Brzostowski, and Father, Robert E. Belfanti III, were never married. An order of court was entered on August 3, 1998, providing for shared legal and equal physical custody of the minor child. On April 28, 1999, Father filed his petition and reasons for change of name and Mother filed her answer and objections on May 27, 1999. A hearing was held on June 28, 1999.

" 'The court of common pleas of any county may by order change the name of any person resident in the county.' 54 Pa.C.S. §702. The statutory scheme sets forth no criteria for the court to consider when exercising its discretion upon a petition for change of name. The only prohibition within the statute appears at section 705: 'Any person violating the provisions of this chapter for purpose of avoiding payment of taxes or other debts commits a summary offense.' "

In a case of first impression *In re Change of Name of Zachary Thomas Andrew Grimes to Zachary Thomas Andrew Grimes-Palaia,* 530 Pa. 388, 609 A.2d 158 (1992) the Supreme Court noted the following:

"The focus of the statute and the procedures thereunder, indicate a liberal policy regarding change of name requests. The necessity for judicial involvement centers on governmental concerns that persons not alter their

identity to avoid financial obligations. Beyond requiring compliance with the notice provisions, the statute provides no additional guidance for courts considering petitions for change of name. Absent any legislative criteria, courts reviewing petitions for change of name exercise their discretion 'in such a way as to comport with good sense, common decency and fairness to all concerned and to the public.' *Petition of Falcucci [Name Case],* 355 Pa. 588, 592, 50 A.2d 200, 202 (1947)." *Grimes, supra* at 392, 609 A.2d at 160.

The court specifically held the appropriate standard for determining whether to grant a petition to change the name of a minor child is the best interest of the child, and the petitioner seeking to change the name must bear the burden of establishing the aforesaid.

In the absence of statutory guidelines, the court opined as follows:

"Specific guidelines are difficult to establish, for the circumstances in each case will be unique, as each child has individual physical, intellectual, moral, social and spiritual needs. See generally, *In re Davis,* 502 Pa. 110, 465 A.2d 614 (1983). However, general considerations should include the natural bonds between parent and child, the social stigma or respect afforded a particular name within the community, and, where the child is of sufficient age, whether the child intellectually and rationally understands the significance of changing his or her name.[6]

"6. We note, that in Pennsylvania there exists no legal requirement that a child bear the surname of either parent. Title 28 of the Pennsylvania Code provides:

*"Section 1.7 Registration of children born in wedlock.*

"(a) The designation of a child's name, including surname, is the right of the child's parents. Thus, a child's surname as recorded on its birth certificate may be the surname of either or both of the child's parents, a surname of the parents in hyphenated or other form, or a name which bears no relationship to the surname of either parent." *Grimes, supra* at 394, 609 A.2d at 161.

In turning to the record testimony, the father and paternal grandparents testified in support of the petition and mother testified in opposition.

## PATERNAL GRANDMOTHER

Cecelia Belfanti testified her son "Bobby" resides with her and her husband. She stated when "Bobby" has "Jake," he is the primary caretaker, and he does "everything humanly possible as a father for his son." When her son is working and he has custody, she cares for her grandson. She also agreed that the mother is a good and appropriate caretaker.

## PATERNAL GRANDFATHER

Robert Belfanti II testified to the circumstances prior and subsequent to the birth of his grandson. He noted the mother resided at their home with his son during part of her pregnancy. After a period of time he noted the relationship between his son and Christie became strained and it was apparent they were not "moving towards marriage." He believed the basis for the strain was Christie's jealousy regarding her son's closeness and time spent with his family. Initially, as to the future name of the child, he perceived the dispute between his son and

Christie was whether the child's name would be Robert Belfanti IV, and did not believe the last name of Belfanti was at issue. As the couple's relationship deteriorated, he stated Christie said his son Eric would not be the child's godfather, the baby would not be named Bob Belfanti IV, and she threatened to move to Maryland with an old boyfriend. Ultimately, he and Christie engaged in a shouting match and he asked her to leave the Belfanti home.

Subsequent to the separation, Mr. Belfanti stated he arranged three meetings between the prospective parents and maternal and paternal grandparents. These meetings were to discuss co-sponsoring a baby shower and attempts to ameliorate some of the strain, threats and anger between the prospective parents. At one of the meetings (which he claimed occurred a few weeks after Christie vacated the home), which Christie was present for all but approximately 10 minutes, he stated Christie's mother, Robin, chastised Christie "not to use the baby" and that she (Robin) "would not allow any of the threats to be carried out." He indicated Christie did not respond or react to her mother's comments. Despite the attempts to utilize Christie's parents as buffers, Mr. Belfanti claimed Christie engaged in a series of actions that were contrary to certain understandings between them. As to the baby shower, he stated rather than the guests being equally divided between the families, since the families were splitting the costs and responsibilities for the shower, "she cut our side to 50 and her side to 100." As to distribution of the same gifts (*i.e.* five play-pens) he stated the Belfantis ranked fifth in the hierarchy. Also, it was his understanding the Belfantis would be advised when Christie went into labor but such did not occur,

and in fact, when his son and wife went to the hospital the morning after the child was born, they were denied access to the baby and "thrown out of the hospital." He also noted the announcement in the paper made no reference to the father of the child, and no Belfanti was invited to the christening.

Finally, Mr. Belfanti spoke with pride about what he characterized as the "Belfanti tradition" of being a close and involved family (camping, scouting, shuffleboard), with no history of divorce, and that the name has a high standing in the community due, in part, to his profession as a member of the Pennsylvania House of Representatives for the last 20 years, and his many acts of public service that benefitted the community. He concluded with his concern that while a child born out of wedlock has less stigma than in the past, he still believed such children may be referred to as "illegitimate or bastards." As to his grandson specifically, he felt Jake would have fewer questions to answer about who his dad is, or to other kids Jake encounters when he is growing up.

## FATHER

Robert E. Belfanti III explained that he has custody of his son on an equal basis with the mother and "it is great to see him that much" and that he is "able to raise Jake the way I've been raised." He indicated discussions regarding the child's name occurred not too long after the pregnancy.[1] He claimed the last name of Brzostowski was never discussed but there was an issue as to using

---

1. While not tesified to directly, it was apparent the mother had testing which revealed the sex of the child at some point during the pregnancy.

his first name and that "was kind of a sore point" with him. When asked why such discussions occurred at such a time, he responded it was "very important to me and she knew it." In fact when he went to the hospital the day after the baby was born, and despite being denied access to the baby, he claimed he learned that a "birth certificate was not yet made out." Subsequent to the child's birth, he noted the efforts he, his family, and his lawyer made to persuade the mother to allow him to see his son, were to no avail for over four months. Finally, he filed a petition for special relief and the court granted his request to see Jacob on August 3, 1997. He noted that ultimately he was granted shared legal and equal physical custody and observed that the custody hearing officer recommended the child's name be changed to Belfanti. Like his father, he was concerned about possible stigma and felt "most children born out of wedlock have their father's name," and if they don't they are known as "illegitimate or bastards." He also said he is in a serious relationship and is considering marriage and having three other children who it was agreed would have the Belfanti name. He felt such could cause some confusion if Jacob did not have the same last name. That way he believed Jacob would not "be open to any ridicule in our community since children typically have their father's last name whether in or out of wedlock."

When asked on cross whether he considered Christie to be a friend, he preferred the appellation "acquaintance." He admitted to drafting and delivering a three page letter to Christie about three weeks before the child was born, telling her that if she wished to communicate with him, the only way such was possible was in the presence of their parents, witnesses, or with the use of a

tape recorder. When asked if he sent such a letter,[2] he stated it was because Christie was spreading rumors that he gave her gonorrhea. As to the allegation he denied paternity of the child subsequent to his birth, he stated that he did so upon the advice of his lawyer. Mr. Belfanti, who is employed by the Pennsylvania Department of Environmental Protection, stated he pays regular child support and provides full insurance coverage for his son since December of 1998. He admitted the mother was not aware of such coverage until the day of the hearing.

When asked what Christie's attitude was when he received equal physical custody, he stated "she seemed to think of Jacob as a piece of property," and prior to the order, "she said I was a sperm donor like her father was."[3] In conclusion, Mr. Belfanti stated that regardless of what happens between the mother and him, he "intends and will be a father to this child."

## MOTHER

Christie L. Brzostowski, the mother of Jacob, is currently a student at Bloomsburg University and is also employed part-time. Like the father, she resides with her parents and they, especially her mother, assist her with child care. Mother was initially asked about the meetings arranged with the prospective parents and grandparents subsequent to their breakup. She stated as to the second meeting, we were both there but not for the entire meeting because "I have other things to do, my sis-

---

2. His father admitted he counseled and encouraged his son to take such precautions.

3. It was brought out that the mother was adopted. We are uncertain when she learned of same.

ter came home, errands." She denied any discussion regarding the name of the child being held in her presence. She described the relationship between her and Robert as "not good, lousy together." She stated he did not talk to her subsequent to the breakup, since February, and that Robert did not call her mom to see how she was doing. When questioned about living with the Belfantis, she stated she "stayed there but she did not live there—it wasn't overnight." She said she received the "letter" from Robert on March 9, 1997, the day of the baby shower, and that he called her a "f____ing bitch," and that he did not appreciate the way she treated his mother. She stated "through my pregnancy we basically were broken up" and that they had "arguments, not discussions" regarding the name of the child. After the child was born she stated she told the priest she had "not picked a last or first name yet" because she "wasn't sure." As to the Brzostowski name, she said she is proud of such and that there is nothing bad about the name. When asked how she would describe Jacob, she stated, "he is generally a good kid." She stated her belief that the issue of a name change should be left up to Jacob when he is older. While she is not currently involved in any serious relationship, she claimed "at the present time I plan to keep the Brzostowski name, noting her college and professional aspirations. When asked if she had previously failed out of Bloomsburg University, she admitted such was due to her pregnancy. When questioned if she failed out of Clarion, she responded she transferred, and when asked what her GPA was at Clarion when she transferred, she responded she "did not recall, that was five years ago."

As to the family name of Brzostowski, she admitted that her paternal grandfather and uncle do not generally

use the name, and their name is listed in the phone book as Birch. She also acknowledges her original name was Timmons which was her mother's maiden name. She acknowledged it was important to the father for the child to have the Belfanti name, but denied she ever agreed to such, and reiterated she was, up to the time of the birth, undecided about a last name, as she had told the priest. When asked if she agreed the Belfanti name was well respected, she, after a very long pause, stated "she did not know." She admitted she did not let the father take the child for several months because of the letter he sent to her, and the fact he or his mother never called after the separation to check on her condition. She candidly admitted, even now, she did not want the father to be taking the baby. When asked about disputed money the father claims he gave her to buy bonds for the baby, and whether she instructed a phone number she reluctantly gave to the father, not be given to any third parties, such as the father's parents, she stated "I don't recall."

## DISCUSSION

More than 300 years ago, William Penn commented "some do as much begrudge others a good name, as they want one themselves: and perhaps that is the reason for it." Mother's begrudging reluctance to admit the Belfanti name is well respected was patent, and without any factual basis to the contrary. At the same time her comment that she initially never agreed to naming the child Belfanti was neither credible nor consistent with her admission that she told the priest she was undecided about a last name even after the baby was born. Such a statement is more consistent with her using the issue of the last name as leverage, in anger, or pique, even up to the child's

birth. The testimony was also consistent with father's clear and unequivocal desire for the child to have, at a minimum, his last name, and preferably have the Roman numeral IV after the surname. At the same time, the father and paternal grandfather's concern that if the child did not have the Belfanti name, he would be known as illegitimate or a bastard was generally unpersuasive. In our years as a teacher, caseworker, lawyer and judge, we cannot recall hearing a child being born out of wedlock referred to as illegitimate. As to the term bastard, we have heard it used in a pejorative sense, but not as a descriptive appellation for a child born out of wedlock. Admittedly, despite the change in our society and the infrequent use of such terms, should such be utilized the potential impact on the child could be devastating. However, despite the father and grandfather's concern we do not consider such to be a substantive factor in this case. Similarly, the changes in our society support, and we agree, the best interest standard should not be used to give greater weight to the father's last name. The best interest standard must be gender neutral.

Turning to the guidelines, the first area addressed by the Supreme Court was the bond between the parent and child. While not dispositive, it is relevant to note father and mother have equal periods of time with the child. In referring to their son, Father noted it was great to see Jacob that much and raise him the way he was raised; while Mother described her son as generally a good kid— a somewhat unusual way to refer to one's 2 1/2-year-old son. Another criteria outlined by the court is the respect afforded a particular name in a community. Given the mobility of our society over the last generation, such may have diminishing impact. Presently, both parents were

born, raised and continue to live in Mt. Carmel. Neither name has any social stigma. Both names are good names. Neither the Belfanti nor the Brzostowski name will cause the child to suffer any embarrassment. However, the record reflects carrying the Belfanti name is more important to the father and his family than it is to the mother and her family.

The request to wait until the child is older and let him choose, or use a hyphenated name (Belfanti-Brzostowski) while plausible on its face, is contrary to our responsibility under the law, or as noted in the Supreme Court in *Grimes,* may be merely an attempt to pacify both parties. When the child is how much older? Before or after he starts school? If, in the exercise of our good sense, we believe the length of time the child has used the surname is relevant, and in the case of an infant or preschool child, suggest the earlier the change, the better, and we believe 2 1/2 is obviously too young, our concern is the potential for the child to be submitted to subtle, or not so subtle, pressure by the parents or interested other, in the interim. Also, Jacob Michael Belfanti-Brzostowski has more letters (31) than the complete alphabet, may be problematic in filling out some forms, and "pacification of parents" is not the legal standard or main issue in this case.

Father's reasons, although somewhat paternalistic and outdated, nonetheless reflect a sincere and consistent effort to have his son bear a name he and his family are proud of; a name, which does carry a good deal of community respect. Mother's motive in maintaining the Brzostowski name is, in our view, a result of her ill will, and at times, hostility toward her child's father, and perhaps her own birth father, both of whom she referred to as mere sperm donors, and one of which she alleged had gonorrhea. In our view, she was not credible when she denied not agreeing that initially, the child's last name

would be Belfanti. Her bias, even 2 1/2 years after the birth of her son (who, even today, she does not want the father to see) suggests the child's best interests will be served, if his mother seeks counseling to deal with recent and perhaps past unresolved issues about the important role of a father, whether birth or step, and the absence of same. This court believes that Jacob Michael Belfanti has a good and loving mother, with a good last name, that now differs from his mother's, not because of who the father or paternal grandfather are, but because as the law clearly states, when naming a child there is no rebuttable presumption in favor of a parent in possession, especially when that parent is "intoxicated with anger," which was still evident in court, but we suspect still hidden from herself.

In consideration of the foregoing we enter the following:

## ORDER

And now, July 1, 1999, the petition for change of name of the minor child Jacob Michael Brzostowski to Jacob Michael Belfanti, is hereby granted. Counsel for the petitioner shall insure compliance with the Act as amended in June of 1998.